May it please the Court and good morning. My name is C.J. Johnson. I am here arguing on behalf of Patrol Helicopters and will be splitting time this morning with Mark Williams. I will be addressing... What are you doing in the case? I thought you were paid off. The claim on the judgment has been satisfied. That is correct. And you don't have a claim for coverage since Progressive stepped up. So with due respect, Counselor, what is Patrol going to help us with that the insurance companies can't handle themselves? Well, Your Honor, Patrol has an interest in seeing that it receives its benefit of the bargain. Didn't you get your benefit of the bargain? You got paid. We did, Your Honor. We got paid by... But there isn't any outstanding attorney's fees issue or anything else floating around as far as you're concerned, right? On remand, Your Honor, if we prevail on the coverage issues, there will be an attorney's fees claim made by Patrol. So is that it? That's your stake in this? From a financial perspective, Your Honor, yes, that's true. I think the distinction to be drawn here is that from a personal stake perspective, the personal stake... Well, wait a minute. Let me make sure that I understand this. My understanding is that Counsel was provided by the insurance company. For the underlying claim, that is correct. So Patrol never paid attorney's fees? That is correct, Your Honor. So you really don't have a stake in this, even with the attorney's fees? You're not at risk at all in this appeal, are you? Your Honor, there is no financial risk to Patrol in this appeal. Then why are you here? Patrol wants Excel to step up and do what it's supposed to do under its contract of insurance. Thank you. I think we understand that. Should we hear from Excel then, or should we hear from the company then? Well, Your Honor, I'm also arguing coverage, and I believe that Mr. Williams would designate time to me to argue the coverage issue also. Very well. Between the two of you, you have 15 minutes, and if you wish to reserve rebuttal time, it'll come out of your 15 minutes. So watch the clock. Thank you, Your Honor. In that case, we would reserve the remaining period of time and allow Excel to argue the coverage issues as that is their appellate issue. All right. Very well. Thank you very much. Counsel? Made police to court, Counsel. Counsel's name is Ronald A. Bender, attorney for the appellee and cross-appellant to Excel Insurance. In regards to the progressive appeal, the lower court's ruling the progressive's failure to determine the existence of other insurance in the favor of patrol and progressive to tender the underlying defense to Excel bars the claim for contribution. It's clearly supported by controlling law. The Montana case of casualty indemnity is directly in point, decided by the federal court there. Wait a minute. Didn't they go to your client, and your client declined to participate? There is no evidence in the record that there was any tender of the defense or any request that Excel participate in any way prior to the verdict being rendered. I don't think that's right. Not quite right. They invited your client to come to the settlement mediation, did they not? Correct. In the hope that your client would bring its checkbook and contribute some money. Correct. In terms of shortly before the trial, there was that, and Excel indicated they didn't feel there was insurance coverage and they would not participate. As I read the record, there's a substantial amount of discovery that was reviewed by your adjuster, including deposition transcripts, copies of the pleadings. Correct? In that regard, Your Honor, the record's clear that I think there were three deposition transcripts plus some pleadings and interrogatories. But in terms of experts' reports and anything else, in terms of trial tactics or briefs, none of that was provided. But I guess you'd be hard-pressed to say that you had no idea that this claim was being made, given the notification that you received in June. The record is the notification in June came from the underlying plaintiff's attorney. It didn't come from patrol. It didn't come from the... I understand your argument that there was no formal tender, but you're also making the argument that you don't have to show any prejudice, and I guess we'll get to that at some point in terms of your change in position. In the affidavit, it's also established that in terms of discussions between patrols, the underlying counsel, and the adjuster for Excel, that there was no request that they participate in the litigation. No, no. I understand your argument clearly that you're relying on casualty indemnity and the fact that no formal tender was made. But I think what's troubling me, and perhaps my colleague Judge Ezra, is that you clearly had noticed several months before trial that there was a major claim that had been brought against the insured involving a very serious automobile accident with two deaths and serious bodily injury to the two survivors, and your adjuster actually looked at some of the details of surrounding the crash, and yet you're arguing to us that in a later part of the case that you don't have to show prejudice. The only notice, initial notice, came from the underlying plaintiffs. It was in the middle of June. Discovery was closed. It was four months before trial. The discovery had been done. It was a year after the actual suit was filed, two years after the accident. Coming up on that in terms of, yes, they were aware, but in discussions with the patrol counsel, it's clear that they didn't want Excel. Counsel, I think what we're telling you is if you get to the coverage issue, you may have stronger ground, okay? Okay. Well, basically, in terms of the bar on the equitable contribution, clearly under casualty indemnity, it's supporting, it's on all fours with it. There was no inquiry in terms of other insurance. Patrol was put at risk, and where this was not satisfied, places the insurer at risk. The insurer may not seek equitable contribution from a co-insurer. Now, in terms of the coverage, basically it's Excel's position that under the Montana cases, in terms of Wendell and Doris and the other cases out there, that there basically has to be originate from, grow out of, or flow from, and there has to be an end. Well, the language is, quote, arose out of. Isn't that correct? That's correct, Your Honor. It arose out of the maintenance or use of the helicopter. Right, right. And we admit that arising out of has been determined in Montana to be ambiguous, but the test to be implied is set forth in the Wendell, Doris, and the others. Well, when I first looked at this case, it struck me as being a real reach to have an accident many miles away from the airport where the truck that happens to be going to refuel a helicopter arises out of the maintenance or activity of a helicopter. But then we have these Montana cases, so what do we do? Well, the Montana cases, the Montana court says that arising out is ambiguous. We agree with that. But if you look at the Montana cases that basically involve this issue in terms of a vehicle, a covered vehicle, and the accident, it basically has to originate from, grow out of, or flow from, and it has to be, I can never pronounce it, integrally related. Now, that's more than just but for. There has to be some reasonable basis. It can't be tenuous. Now, if you look at the facts of this case, in terms of the Montana cases of Georgenson, Ferrin, where basically they held there was no coverage, not Georgenson, but Ferrin, and one more out there. Excuse me for a moment. Well, in the Ferrin case, the hunting case, where basically the guy was outside the car and the gun exploded, and in the other one where- That was the reloaded ammunition, right? Right. Yeah. I guess the problem, I mean, I think you have a sympathetic argument. I'm having the same problem Judge O'Scanlan is having with Montana case law, which seems to be very, very pro-insured, where there is an ambiguity under the term arising under and where there's no dispute that the fuel truck was a half mile away from the helicopter and en route to refuel the helicopter at the time of the traffic accident. Your Honor, at the time of the accident, the helicopter was powered down, shut off. It was during the lunch hour. It was a half a mile away. The pilot was out of the helicopter. It wasn't being used. It wasn't being made available. So is your position that coverage wasn't triggered until the nozzle touched the fuel tank on the helicopter? That could be one scenario, but there still has to be some reasonable relationship in terms of time and physical location between the covered vehicle and the helicopter in this case. Well, it's undisputed that the truck was headed to refill the helicopter, right? Eventually. Whether it would do it during the noon hour or later is unknown. So that makes the difference? Well, the difference here is just in terms of… So they're having a sandwich and the truck is on its way and they get there 10 minutes before they're finished with their sandwich, then it doesn't apply. But if they get there after they've had their sandwich, then it does apply? I mean, I'm having a hard time drawing that distinction in light of the Montana courts. Well, I think it's just there has to be a reasonable and I can't pronounce it right, integral relation. And it's just not here in this case. But even if we accept you're placing great weight on the fact that the helicopter was shut down and the pilot was having a sandwich or doing whatever he was doing, it seems to me that's a perfect time to refuel the helicopter because it's not operating and you don't want the engine running while you're refueling the helicopter. So when would be a better time to refuel the helicopter? Well, that's up in the air. I don't know exactly. The helicopter's on the ground. To be refueled. In terms of the facts of this case, a half a mile away, during a lunch hour, shut down, it's not in use, it's not being maintained. To say that it originates from, grows out of, and integrally related to it is a stretch. But if we concede, as I think you must, that refueling an aircraft is inherent in maintaining it, then the issue really becomes one of whether the fuel truck being a half a mile away and not having yet reached the aircraft was actually engaged in the act of refueling. And in the face of Montana case law that says we interpret any ambiguity in favor of coverage, it's hard for me to say that the district court erred when it said under Montana law there would be coverage. It still has to be reasonable. It still has to be within the confines of that rubric. And it's our position that under the facts of this case, it is not. There is a case out there where it basically said that maintenance does require that the hose actually be into the tank. And I think we argued that before. So there has to be some closer proximity in terms of time and place for this accident in terms of coverage. And clearly under the Montana case, as you look at it, the ones that hold that there is no coverage, this case is worse than that from my view. Counsel, you may want to reserve a little time on the cross appeal, but it's up to you. I think I will, but I just got one more point to make in terms of in addition, even if there is coverage, we still have the late notice and it's our position it's first under Montana law clearly in terms of a general liability policy. And the federal court said that there is no requirement of any prejudice in order to invoke that. The magistrate judge Lynch found that you had switched positions on this issue, didn't he? In the lower court, we did not argue 100% in terms of whether it was required or not. We cited numerous cases where it said, where the lack of notice voided coverage without any prejudice. We cited those. We shifted and primarily argued that, hey, if there is any prejudice required, it's here. And the last point I want to make is that the judge magistrate, in terms of applying the prejudice, didn't even apply the prejudice rule exception in uninsured motorists and underinsured motorists. If we decide that you had notice in June, what prejudice did Excel suffer in the intervening four months that would have made a difference? Well, first of all, discovery was closed by the time the notice came out. Right. Couldn't participate. So what additional discovery would Excel have done that would have made a difference? In terms of how you want to defend a case, there could be other additional discovery out there. But, I mean, we're speculating. I need some concrete examples here. What is it that Excel was deprived of other than an opportunity to more directly participate in the management of discovery and trial preparation? And to more fully investigate the claim in terms of additional facts or discovery that it wanted to do. Trial strategy, witness interviews, expert investigation of the accident, that has all been closed and was precluded from doing that. We cited at page 58 and 59 of our initial brief that the lack of ability to investigate the claim and potentially settle the case makes late notice automatically prejudice. Counsel, maybe this is unfair in insurance law, but if you were before us representing an inmate on a habeas corpus claim, we would ask you to particularize what additional evidence you have today that if it had been presented to the jury would have made a difference in the outcome of the proceeding. And you're not telling me any evidence. All you're doing is saying, well, we might have been able to influence the outcome differently if we participated in the defense of the case. Other than what I've said, Your Honor, I can't particularize, and that's the state of the record. Okay. Counsel, one last question on the coverage point. What's your best case under Montana law? The Farron case. Barron? Farron, the hunting case. And then there's one other one, which is the – What about Wendell? What does Wendell do? In Wendell, which was an automobile and causing the car to stop, and then the car was trying to make them stop, get out of their car, and punch them and pull them out of the car and beat them up. The court basically held that that was a question of fact to be determined and sent it back in terms of the summary judgment. All right. Thank you, Counsel. You may reserve the rest of your time. Thank you. We'll hear from Progressive. Good morning. Mark Williams from Missoula for Progressive. Let me just state, Mr. Johnson and I, we briefed different issues on the briefing rather than try to duplicate each other. So Mr. Johnson had briefed the coverage issue and the arising out of issue under Montana law. I had briefed the issue of pro rata apportionment between the two insurers, assuming coverage applies. And Mr. Johnson, being such a crack researcher on the issue of arising out of, I hate to deprive him of the chance to explain that to the court. So I'll address the pro rata issues, and then if the court would allow, I'll let Mr. Johnson come back up and respond to some of the arising out of issues, if that's okay. So it's our position, Progressive's position, that if there's coverage, if both policies apply, they're both primary, they both have other insurance provisions, then it's pretty hornbook law that two policies with other insurance provision apply on a pro rata basis. In this case, the underlying court found that, indeed, both Progressive and Excel's policies applied. Both had a duty to defend and a duty to indemnify. So then the next question for us is, how would that work? The underlying court said, well, yes, Excel has coverage, but the court looked at it as an issue of equitable contribution and said that court would not allow equitable contribution. It's our position that this is not a case of equitable contribution because most of those cases of equitable contribution are where one insurer comes in, settles the case, it's done, and then first gives notice to a second insurer. Here we have the second insurer, Excel, being contacted during the litigation before there's an attempted mediation, before there's an offer of judgment, before there's a verdict, before there's a final judgment. And we have the court's ruling finding coverage before that judgment was ever paid. So in our view, it should be a pro rata apportionment. Counsel, I think maybe this really does go to the issue that Mr. Vendor wants to, or Mr. Johnson wants to talk about. But it strikes me as a really bad fact for Progressive that you could have settled this claim for a million dollars. You made a decision to reject it and to counteroffer $250,000, and the jury hit you with $2.5 million. Aren't you basically just looking to fob off onto Excel the results of your bad decision in rejecting the policy limits demand? Well, so first, that rule would apply if there was no Excel coverage. If there was only the Progressive coverage, then clearly that would be the rule. Progressive didn't settle within limits when it had a chance to do so. But as we know from this case, and as the district court commented, once the Excel policy was found and a demand was made, then that's not really relevant because then the plaintiff said to both parties, we want both Progressive and Excel to contribute. There was talk about having a mediation, and the plaintiff said, we'll go to a mediation as long as Excel comes too. That was passed on to Excel. Excel refused to come. But at that point, had Progressive rejected the policy limits demand? Yes, that was a few months later. Okay. A few months later that the policy limits demand was made? The policy limits demand was made early in the year, and then in June the communication began with Excel. Okay. So Progressive had already made its decision that it was not going to agree to a policy limits demand before Excel got the letter from plaintiff's counsel. But then the 250 response was made after Excel was in the game, and patrol counsel says to Excel, would you contribute too to an offer of judgment? Excel says, no, we're not going to contribute. And I think that also goes to the issue of would earlier notice have made any difference? Because once Excel did have notice and is invited to contribute to an offer or to come to mediation, they say, no, we don't have coverage. So if they had been advised of the policy limits offer several months earlier, presumably they would have just said the same thing then. No, we don't have coverage. We're not going to contribute. I didn't see. Excel never formally denied coverage, did they? Is this just the email exchange between counsel? Exactly. Not by letter. It's just confirmed by emails. I understand Excel is not going to contribute. Excel doesn't think they have coverage, that sort of thing. And then Excel files their deck action saying patrol is claiming coverage. We're denying coverage. And what is the state court litigation that's going on in Montana District Court now? Well, the only remaining litigation, there's a bad faith case. The underlying plaintiffs sued both Progressive and Excel after they got the large judgment in the car accident case. And then Excel has since. So how is this? Montana has broad third-party bad faith. Apparently so. Yeah, so it's sort of a guessing wrong situation. You didn't pay us. We got a bigger judgment. We're suing you for bad faith, even though you've paid the judgment now. Wow. So unless there are specific questions on pro rata, I'd like to allow Mr. Johnson to talk about the arising out of issues. Thank you very much. May it please the Court. Your Honors have correctly noted that arising out of under Montana laws, it is expansive. And the one phrase from Wendell that has never been repeated or articulated by Excel in this case is the fact that almost any causal connection will do. That's the standard from Wendell. Farron cites Wendell. Wendell is the seminal case. And when we say that almost any causal connection will do, of course that includes but for causation. The Wendell Court said that the injury-causing insured interest need not be the instrumentality but rather a prime accessory without which the injury-producing incident would not have occurred. Let me ask you, Counsel. This happened a half a mile away from the airport or wherever the helicopter was. Suppose it happened in the next town. The fuel truck is based 20 miles away. And it happened 20 miles away. What about that? That would be a more tenuous connection, Judge. So what's the difference? The difference is that this is a half mile outside of Livingston, Montana. This helicopter is conducting and supporting seismograph operations over hundreds of square miles. And there is a very large difference between a one-half mile here in downtown Seattle and a half mile outside Livingston, Montana. A half mile in Livingston, Montana, Judge, and you're still in your own backyard. This is a very short distance. All right. So 20 miles is out. What about 10 miles? Those, you know, you've got a large area that's part of the city, part of the town. Yes, Judge. This is the reason why Wendell says that every single case is to be decided on its own discrete facts. And respectfully, Judge, I would not concede that 20 miles would be out. I would concede that that would, by virtue of distance alone and proximity, be more tenuous. In this case, we're a half mile away, and the only reason why that fuel truck is where it's at is because of the helicopter. And Mr. Bender's questions, I'm sorry, Mr. Bender's statements, what EXSL would like to do is replace a rising out of the use with because of ongoing use or because of ongoing maintenance. And as Judge Tomlin noted, there is no nozzle in the tank requirement. It's a totality of the circumstances. And in this case, what we have is a helicopter that has landed because it's been using fuel, and it's landed because it needs fuel because of that use. It cannot be used again until it gets fuel. And it's because of that need that it calls the fuel truck and says, we need you here at this specific location and staging area. So if you had a situation, for instance, where the truck belonged, say, to a third party, it is coming to simply dump fuel into a common fuel tank that is used by all aircraft at that particular airport, even though it's the intention of the owners of Pilot to utilize that fuel. Anybody could utilize it. And so you wouldn't have a but-for connection. Academically, I think you would. I think the practical reality is that would not be sufficient. That wouldn't be. But in this case, they actually hired this truck. It belonged to Pilot, didn't it? It belonged. Your Honor, the Patrol helicopter was piloted by Steve Lyons. The Patrol's fuel truck was driven by his son. Okay. They're both owned by Patrol. I keep saying Pilot. I meant Patrol. So you have Patrol specifically. They own the truck. It's specifically going to this helicopter to refuel it for imminent operations. Is that right? Yes, Judge. Its load, its weight, its destination, everything about that truck that day, including turning left when this accident occurred, arose out of the helicopter's maintenance or use. Well, now, it wasn't in the process of being refueled. And there's no way to know whether the helicopter would have been refueled for certain that day, is there? I mean, there's not evidence in the record saying that the helicopter was standing there waiting to get refueled and this truck was on the way to do that? Your Honor, stipulation of fact 13, I believe it's in the appellant's excerpts of record. It's either at page 182 or those stipulations begin at page 182 of the AER. Paragraph 13 says that the helicopter was parked for purposes of refueling, and that is a fact that Excel has also stipulated.  What about the truck? What's the evidence that the truck was committed to fueling the helicopter within minutes after this accident? Well, Your Honor, because the helicopter was parked for purposes of refueling, the fuel truck was loaded with fuel. It was patrol's fuel truck. The driver of the truck had been contacted by the helicopter pilot, and the helicopter pilot said, we need fuel to get over here, and that's the only reason why the fuel truck was headed that way. That's all in the record? Yes. Do Your Honors have any additional questions for me? Thank you very much. Counsel, anything further from your side? No. You have some reserved time, Counsel. In terms of the pro rata issue, there is no pro rata issue here. The progressive other insurance clause clearly makes progressive primary when a specifically named auto is involved in the claim. The three other insurance A language says, for any insured auto that is specifically described on the declarations page, this policy provides primary coverage. The fuel truck was in the deck page. That was the only vehicle out there. Clearly under its own policy, it's primary. In addition, the case is cited at 3739 of our brief. Deal with the case law on that, and the case law is precisely the point where a policy basically defines a specific automobile. It's primary. So there is no pro rata argument out here. In regards to what the fuel truck was doing, there's nothing in the evidence in terms of when the fuel was going to take place, whether it was imminent or whatever. The only evidence is that it had moved from a prior spot where they were doing work to this new field. It was during lunch hour. It was shut down, and there's no evidence as to when it would be fueled or if it would be fueled. Also, in terms of the Montana. So you and opposing counsel have conflicting interpretations of what's in the record, and we'll have to see what's in the record. We stipulated that the truck was for purposes of refueling. We didn't stipulate when and where and how and when it was imminent. The evidence is that they were shut down. Was there stipulation or some evidence which established that the truck was on the way to the helicopter for the purpose of refueling? I don't believe so, but don't hold me to that. I mean, my recollection was that that stipulation was basically that it was for purposes of refueling, but not as to a specific time. Well, that's the helicopter. I'm trying to focus on the truck. What's the evidence on what the connection between the truck and the helicopter? That's what I'm trying to zero in on here. I don't think there's anything in the record in terms of how imminent it was that it was going to be refueled. All right. Okay. Lastly, I'd just like to say that any causal connection is not the law in Montana. It has to be something more than but more. Judge Hadfield in the Georgeson case, the wire that was strung from the spool on the truck up to the pool, Judge Hadfield said it has to be more than but for. It has to be integrally related to activities and injury at the time of the accident. That's just not the case here. All right. Thank you. Thank you, Counsel. The case just argued will be submitted for decision, and the Court will adjourn.
judges: Ezra, O'scannlain, Tallman